UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| BRUCE EISEN,<br><br>              Plaintiff(s),<br><br>vs.<br><br>PORSCHE CARS NORTH AMERICA, INC.,<br><br>              Defendant(s).<br>_____ | Case No.  2:11-cv-09405-CAS-FFMx<br><br>ORDER GRANTING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT |

**I. INTRODUCTION**

The motion of plaintiffs Bruce Eisen, Kymmberli R. Ureda, Lee Smith and Frederick Nelson-Bonebrake for final approval of class action settlement came on for hearing on January 6, 2014.

Plaintiffs were represented by Stephen M. Harris and Barry R. Gammell of Knapp, Petersen & Clarke.  Defendant Porsche Cars North America, Inc. was represented by Stephen T. Waimey and Yvonne Dalton of Lee, Hong, Degerman, Kang & Waimey and Jeffrey A. Rosenfeld of DLA Piper LLP (US).

On November 10, 2011, plaintiff Bruce Eisen brought this class action case against Porsche Cars North America ("PCNA") on behalf of himself and a putative

class of California consumers alleging claims for (1) violation of the California Consumer Legal Remedies Act, Cal. Civil Code § 1750, et seq., (2) violation of the California Unfair Business Practices Act, Cal. Bus. & Prof. Code § 17200, et seq., and (3) fraud. Dkt. 1.

On January 11, 2012, PCNA moved to dismiss the complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). Dkt. 8. The Court granted the motion to dismiss with leave to amend. Dkt. 14. On October 10, 2012, plaintiffs Eisen, Ureda, Smith, and Nelson-Bonebrake filed the first amended complaint ("FAC") on behalf of a putative nationwide class for (1) breach of express warranties, (2) violation of various state consumer protection statutes, and (3) breach of the implied warranty of merchantability. Dkt. 26. Plaintiffs seek relief on behalf of a class comprised of "all persons throughout the United States who currently own or lease a Class Vehicle[1] and who have sustained damages as a result of an engine failure due to the Engine Defect" and "all persons throughout the United States who previously owned or leased a Class Vehicle and who have sustained damages as a result of an engine failure due to the Engine Defect." Dkt. 26; FAC ¶¶ 83, 84.[2] The alleged defect at issue relates to an engine part known as an Intermediate Shaft ("IMS"). The IMS is the shaft connecting the engine camshaft to the engine crankshaft and permits the transfer of force from the pistons to the transmission and its related drive chains. Id.

After two mediation sessions conducted by the Hon. Edward J. Wallins, a retired

---

[1] "Class Vehicles" are defined as all Model Year 2001 - 2005 Porsche Boxster vehicles manufactured with an Intermediate Shaft between May 4, 2001 and February 21, 2005, and all Model Year 2001 - 2005 Porsche 911 vehicles manufactured with an Intermediate Shaft between May 4, 2001 and February 20, 2005, excluding the Turbo, GT2 and GT3 models, with Vehicle Identification Numbers in certain specified ranges. See Settlement Agreement § 1, ¶ 2a.

[2] The operative complaint alleged claims on behalf of a class and sub-class, but a single class is sought to be certified for purposes of the settlement. Settlement Agreement, § III, ¶ 19; FAC, ¶ 84.

Justice of the California Court of Appeal, the parties agreed to terms of a settlement and thereafter to an award of attorneys' fees and costs in an amount not to exceed $950,000.

The Court entered an order preliminarily approving the settlement on April 24, 2013. Dkt. 42. The Class Action Settlement Agreement ("Settlement Agreement") provides enhanced repairs to owners of Porsche automobiles covered by the settlement.

Porsche provides an express warranty to purchasers of new vehicles that is in effect for four years after purchase or 50,000 miles, whichever comes first. Porsche also provides an extended warranty to purchasers of pre-owned vehicles. Harris Decl. ¶ 28. The Settlement Agreement permits class members to obtain reimbursement for out-of-pocket expenses already incurred for IMS-related repairs and provides for the repair of engine damage or replacement caused or contributed to by the vehicle's IMS, up to ten years after the vehicle was first placed in service, or 130,000 miles, whichever first occurs. Moreover, settlement class members can receive limited reimbursement (up to $200) for out-of-pocket towing and rental expenses. Agreement, § III, ¶ 4(j) and (1).

The payment and reimbursement percentages made available to the class are set out in the table below will be based on mileage without regard to time that has elapsed since the vehicle was first placed in service, except that no class member will be entitled to any payment or reimbursement for any IMS damage occurring to a Class Vehicle more than ten years after the vehicle was placed in service and the new vehicle warranty period commenced, normally but not exclusively, the date of sale to the original customer. Settlement Agreement, § III, ¶ 4(j). The payment or reimbursement for IMS expenses will only be for "Repairs" as defined in the Settlement Agreement.[3]

The Settlement Agreement's Payment and Reimbursement Schedule for Repairs

---

[3] "Repair(s) means the cost of the parts and labor used to repair engine damage, including, without limitation, repair or replacement of the engine caused or contributed to by an IMS in a Class Vehicle and in addition, limited costs for towing and/or replacement vehicle rental during the repair period as provided for in this Agreement." Settlement Agreement § I, ¶ 20.

3

is as follows:

|  | **New Vehicle Purchasers** | **ACPO Purchasers**[4] | **Open-Market Used Vehicle Purchasers** |
|---|---|---|---|
| Up to 50,000 miles | 100% | 100% | 25% |
| 50,001-60,000 miles | 90% | 100% | 25% |
| 60,001-70,000 miles | 80% | 100% | 25% |
| 70,001-80,000 miles | 70% | 100% | 25% |
| 80,001-90,000 miles | 60% | 100% | 25% |
| 90,001-100,000 miles | 50% | 100% | 25% |
| 100,001-130,000 miles | 40% | 40% | 25% |

Id. Following the mailing of notice to 235,152 potential class members and the creation of a website making available to potential class members details regarding the settlement, 3,275 claims were received, 243 persons opted out of the class, and 53 persons filed objections. Three of the objectors appeared at the hearing on plaintiffs' motion for final approval of the settlement.[5]

The objections may be categorized as follows:

Thirty-one objections are directed to the Payment and Reimbursement Schedule for Repairs. These objections assert that (1) the settlement is unfair because purchasers of used vehicles will receive less compensation than purchasers of new vehicles or

---

[4] Approved Certified Pre-Owned Vehicle.

[5] The objectors who appeared are Evan Morris, Michael Bilodeau and Jill Weitzner through her attorney, Eric A. LaGuardia.

approved certified pre-owned vehicles, (2) owners should not be required to obtain repairs from authorized Porsche dealers, (3) all vehicles affected by the IMS issue should be included in the class, and (4) the settlement discriminates in favor of new ACPO purchasers and fails to permit used vehicle purchasers to purchase an ACPO warranty.

Twenty objections are directed to vehicle age and mileage criteria.[6]

Thirteen objections are directed to the absence of compensation for diminished value for vehicles caused by the alleged IMS defect issue.

Fifteen objections assert that the settlement is unfair because it requires claimants to demonstrate actual damages caused by the vehicle's IMS and does not provide for preventive repairs.

Finally, one objector objected to the scope of the release and another to the provision for attorneys' fees agreed to by the parties.

## II.   LEGAL STANDARD

In evaluating fairness of a class action settlement, the Court must consider and give approval to the proposed settlement as a whole, rather than any individual provision of the agreement. See Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026-27 (9th Cir. 1998). In considering whether a proposed settlement should be approved, the courts looks to the following factors:

> [T]he strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the

---

[6] Objector Michael Bilodeau stated that his vehicle was unfairly excluded because it was slightly more than 10 years old.

reaction of the class members to the proposed settlement.

Id. at 1026 (quoted in Lane v. Facebook, Inc., 696 F.3d 811, 819 (9th Cir. 2012)). When the settlement precedes class certification, settlement approval requires a "higher standard of fairness." Hanlon, 150 F.3d at 1026. The reason for this is to ensure that counsel and named plaintiffs do not benefit themselves disproportionately at the expense of absent class members. Id. at 1027.

## III. ANALYSIS UNDER HANLON FACTORS

### A. Strength of Plaintiffs' Case; Risk, Expense, Complexity, and Likely Duration of Further Litigation

The Court first examines the likelihood of success on the merits and the range of possible recovery. See Rodriguez v. W. Publ'g Corp., 563 F.3d 948, 964-65 (9th Cir. 2009). In considering the probability of success on the merits, there is no "particular formula by which that outcome must be tested." Id. at 965. To the contrary, the Court's consideration of the likelihood of success on the merits is "nothing more than an amalgam of delicate balancing, gross approximations and rough justice." Officers for Justice v. Civil Serv. Comm'n of San Francisco, 688 F.2d 615, 625 (9th Cir. 1982) (internal quotation marks and citation omitted).

Moreover, the Court need not "reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of the outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." Id. Because absolute precision is impossible, "ballpark valuations" are permissible, especially when reached after mediated negotiation among non-collusive parties. See Rodriguez, 563 F.3d at 965 ("We put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution . . . .").

Similarly, "unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results."

Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc., 221 F.R.D. 523, 526 (C.D. Cal. 2004) (quoting 4 A. Conte & H. Newberg, Newberg on Class Actions, § 11:50 at 155 (4th ed. 2002)). This general rule applies with special force to class actions. See Van Bronkhorst v. Safeco Corp., 529 F.2d 943, 950 (9th Cir. 1976) ("It hardly seems necessary to point out that there is an overriding public interest in settling and quieting litigation. This is particularly true in class action suits which are now an ever increasing burden to so many federal courts and which present serious problems of management and expense." (footnote omitted)).

Here, no class was certified for litigation purposes prior to the settlement and the parties recognize the risks in seeking or maintaining class certification through trial. Settlement avoids all possible risks of continued litigation, including the possibility that plaintiffs would not succeed at trial. Here, the advantage to the Class of avoiding those risks favor settlement of this action.

To assess whether the amount offered is fair, adequate, and reasonable, the Court may compare the settlement amount to the parties' estimates of the maximum amount of damages recoverable in a successful litigation. In re Mego Fin. Corp., 213 F.3d at 459. While settlement amounts that are close to the plaintiffs' estimate of damages provide strong support for approval of the settlement, a settlement that offers a lesser amount of the potential recovery does not preclude a finding of fairness. Id. (finding settlement amount constituting one-sixth of the potential recovery was fair and adequate); see also Hanlon, 150 F.3d at 1027 (holding that the possibility that the settlement amount could have been greater "does not mean the settlement presented was not fair, reasonable or adequate"). "This is particularly true in cases . . . where monetary relief is but one form of the relief requested by the plaintiffs." Officers for Justice, 688 F.2d at 628. It is unquestionable that the settlement provides substantial relief to all class members in the form of reimbursement for costs and expenses incurred due to the alleged IMS defect and extended warranty protection in the future.

Here, the parties submit, the class is receiving nearly as much as could reasonably

be expected after a successful verdict at trial because they are recovering all or a substantial portion of the cost of repairing the IMS. The alternative would be protracted litigation, requiring retention of experts and significant expenses. PCNA would vigorously oppose class certification. These costs, when weighed against the benefits of the settlement, suggest that the settlement is fair, adequate, and reasonable.

### B. Extent of Discovery Completed and the Stage of the Proceedings

Consideration of the extent of discovery and the current stage of the litigation allows the Court to evaluate whether the parties are able to make decisions about their claims based on information received during the discovery process. See Linney v. Cellular Alaska P'ship, 151 F.3d 1234, 1239 (9th Cir. 1998); In re Cylink Sec. Litig., 274 F. Supp. 2d 1109, 1112 (N.D. Cal. 2003). Where a settlement is reached in an advanced stage of the proceedings, this factor supports a finding that the parties had the opportunity to investigate their claims before resolving them. Alberto v. GMRI, Inc., 2008 WL 4891201, at *9 (E.D. Cal. Nov.12, 2008); Murillo v. Pac. Gas & Elec. Co., 2010 WL 2889728, at *8 (E.D. Cal. July 21, 2010).

Here, discovery was limited because the parties decided to pursue settlement discussions early on. Plaintiffs nonetheless performed substantial investigation to determine whether the terms of settlement were justified. Specifically, plaintiffs conducted an investigation, including but not limited to retaining an expert consultant regarding IMS failures, reviewing PCNA technical service bulletins, reviewing publicly available IMS-related information, and obtaining and reviewing over 4000 pages of IMS-related documents produced by PCNA. Plaintiffs took the deposition of Alan Butler and Steffan Russert and monitored complaints made to the National Highway Traffic Safety Administration ("NHTSA"), as well as reviewing related lawsuits. Harris Decl. ¶ 9. On this record, the Court concludes that all counsel had ample information and opportunity to assess the strengths and weaknesses of their claims and defenses. Accordingly, this factor weighs in favor of settlement.

### C. Experience and Views of Counsel

The Court places a great deal of reliance on the decision by sophisticated parties to agree to settle their dispute. This reliance is predicated on the fact that "[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation." In re Pac. Enters. Sec. Litig., 47 F.3d 373, 378 (9th Cir. 1995). The recommendations of counsel are given great weight since they are most familiar with the facts of the underlying litigation. Nat'l Rural Telecomms., 221 F.R.D. at 528. Additionally, where the services of a private mediator are engaged, this fact tends to support a finding that the settlement valuation by the parties was not collusive. See, e.g., Lusby v. Gamestop Inc., 2013 WL 1210283, at *10 (N.D. Cal. Mar. 25, 2013); Villegas v. J.P. Morgan Chase & Co., 2012 WL 5878390, at *6 (N.D. Cal. Nov. 21, 2012); Hartless v. Clorox Co., 273 F.R.D. 630, 641 (S.D. Cal. 2011). Here, settlement was achieved with the assistance of an experienced retired judicial officer. Moreover, all counsel were sophisticated and able to judge the reasonableness of the settlement achieved.

### D. Reaction of the Class Members to the Proposed Settlement

The absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of the settlement are favorable to the class members. Nat'l Rural Telecomms., 221 F.R.D. at 529; In re Omnivision Techs., Inc., 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008); see also In re Mego Fin. Corp., 213 F.3d at 459 (single objection out of a potential class of 5400); Churchill Village, LLC v. Gen. Elec., 361 F.3d 566 (9th Cir. 2004) (500 opt-outs and 45 objections out of approximately 90,000 notified class members).

As noted, class response has been overwhelmingly supportive of the settlement. Although 235,152 class notices were sent, only 243 class members have asked to be excluded, and only 53 have filed objections to the settlement. These numbers should be contrasted with the more than 3,200 claims submitted to the settlement administrator.

See Keough Decl. ¶¶ 5,11-12.

This factor weighs in favor of approval of the settlement.

**IV. ANALYSIS**

All of the Hanlon factors favor settlement. The proposed settlement represents a significant portion of what plaintiffs could expect to receive if they prevailed on the merits, and plaintiffs' decision to settle their claims on the terms agreed to by the parties represents a reasoned assessment of the risk and expense of continued litigation. The proposed settlement was negotiated between informed counsel with the assistance of an exceptionally able and experienced mediator. These factors support approval of the settlement, and the objections submitted to the settlement do not alter that analysis.

**A. The Repair Payment Schedule Appropriately Differentiates Between Owners Who Purchased New, ACPO, and Open-Market Used Vehicles.**

Certain objectors complain that the Settlement Agreement provides different levels of recovery (ranging from 100% to 25% of repair costs) based on (1) whether the class member purchased a new, ACPO, or used vehicle, and (2) vehicle mileage at the time of IMS damage. These objectors complain that PCNA is not offering to pay 100% or some other high percentage of repair costs to *all* class members, and appropriately to take into account differences among categories of class members. Such contentions fail to consider that a settlement is a compromise of disputed claims. See, e.g., Petrovic v. Amoco Oil Corp., 200 F.3d 1140, 1146 (8th Cir. 1999) ("[A]lmost every settlement will involve different awards for various class members."); Henderson v. Volvo Cars of N. Am. LLC, 2013 U.S. Dist. LEXIS 46291 (D.N.J. Mar. 22, 2013) (overruling objections requesting 100% reimbursement for transmission replacement costs where class settlement provided original and certified pre-owned owners 50% reimbursement of such costs while used vehicles owners were eligible for only 25% reimbursement).

Indeed, the Settlement Agreement reflects an appropriate compromise between

the Class and PCNA.  It is appropriate for the settling parties to balance and evaluate settlement terms based on their reasonable view of the issues in the case and "'there is no rule that settlements [must] benefit all class members equally.'"  <u>Petrovic</u>, 200 F.3d at 1152 (quoting <u>Holmes v. Continental Can Co.</u>, 706 F.2d 1144, 1148 (11th Cir. 1983)).  The Settlement Agreement reflects the fact that PCNA faces more litigation risk from new and ACPO purchasers than used vehicle purchasers.  This risk derives from the relative closeness of PCNA to purchasers who visited PCNA's dealership network vis-à-vis purchasers who bought used vehicles from private sellers, usually "as is," without any warranty from the sellers.  In the former case, dealerships affiliated by contract with PCNA had direct contact with the Class members at the point of sale; in the latter case, typically no such contact occurred.  The fairness and reasonableness of the settlement is underscored by the fact that each of the named plaintiffs falls within the used owner category.  Thus, there is no basis to conclude that the representative plaintiffs will benefit at the expense of absent class members who are owners of used vehicles.  The reality is that the representative plaintiffs will receive less than many other class members with valid claims.

Any objection that the settlement should be expanded to encompass additional vehicle model years has no merit as such owners are not bound by the settlement and are free to seek relief if appropriate.  Similarly, objections that the settlement excludes the claims of those who have already received payments (e.g., from third-party insurance companies) must be rejected because it is not unfair to be limit recovery to actual net out-of-pocket costs.

Moreover, the requirement that repairs be made at authorized Porsche dealerships is also reasonable.  PCNA is entitled to ensure that newly submitted engine repair claims are based on IMS-related damage and not on other issues, such as improper maintenance or abuse.  Although one objector argues that independent mechanics could do the repairs more cost effectively (i.e., more cheaply), that objection does not undermine the settlement.  Authorized dealerships with the full support of

PCNA's sophisticated technical guidance and equipment can most effectively perform Porsche engine repairs, and PCNA has an unquestionable interest in seeing that these repairs are conducted correctly. Far from class members being unfairly prejudiced by this requirement, this provision ensures that repairs will bemade in the proper manner, with proper parts by knowledgeable and properly trained technicians.

In any event, class members could have opted out if they objected to the benefits offered by the settlement. See Henderson, 2013 U.S. Dist. LEXIS 46291, at *28 (noting that "any Class Member who objected to the adequacy of relief had the option of opting out of the Settlement and pursuing his or her own case against Volvo"). Federal courts routinely hold that the opt-out remedy is sufficient to protect class members who are unhappy with the negotiated class action settlement terms. See id.; see also Milligan v. Toyota, No. 3:09-cv-05418-RS, slip op. at 13 (N.D. Cal. Jan. 6, 2012) (overruling multiple objections to a class action settlement, noting that objectors "could have simply opted out"); In re Nissan Radiator/Transmission Cooler Litigation, 2013 U.S. Dist. LEXIS 116720, at *9 (S.D.N.Y. May 30, 2013) ("In re Nissan") (overruling multiple objections to a class action settlement stating that objectors "have the ability to opt-out if they do not like the terms of the settlement"). The opt-out remedy available here is similarly sufficient to protect those class members who are dissatisfied with the terms of settlement.

For the foregoing reasons, the Court concludes that the cost reimbursement schedules were fair and reasonable.

**B. Limiting Recovery to Damage Occurring Within 10 Years and 130,000 Miles of the Vehicle's In-Service Date is Fair and Reasonable.**

Certain objectors also objected to the 10-year/130,000-mile limitation on claims. These objectors complain that 10 years is too short a time period since Porsche owners typically drive their vehicles less miles per year than owners of other vehicles. However, this claim is not supported by any evidence, either as to Porsche-brand or

12

"other" vehicles. Even if true, it would not alter the fact that negotiations on issues such as these must by their nature include reasonably negotiated eligibility limitations. The vehicle age and mileage criteria are also consistent with those offered in other automotive class action settlements. For example, in Collado v. Toyota Motor Sales, U.S.A., Inc., 2011 U.S. Dist. LEXIS 133572, at *6-7 (C.D. Cal. Oct. 17, 2011), the district court rejected objections that the settlement's 5-year/50,000-mile restriction was unfair, stating that "there has to be some reasonable limit to the warranty period, as any longer warranty period would defeat the purpose of a limited warranty." Similarly, in In re Nissan, the court held that objections to the 10-year/100,000-mile cut-off was "not a basis for finding the settlement is unfair or unreasonable." In re Nissan, 2013 U.S. Dist. LEXIS 116720, at *9; see also Milligan, No. 3:09-cv-05418-RS, slip op. at 12 (rejecting objections to a class action settlement with vehicle age and mileage requirements of 10 years and 150,000 miles). As the court in In re Nissan held, "negotiating a cut-off at some point was necessary." In re Nissan, 2013 U.S. Dist. LEXIS 116720, at *9 (citing Henderson, 2013 U.S. Dist. LEXIS 46291, at *9); see also id. at *11 ("The Court further notes that members who are not satisfied with the level of compensation provided may opt-out of the class and pursue their own claim.").

It is significant that the Settlement Agreement provides extended warranty coverage that exceeded the warranties provided by PCNA to new and ACPO vehicle purchasers, and even includes warranty protection to purchasers of used vehicle purchasers who bought their vehicles without any contractual warranty coverage at all.

**C. Providing Compensation for Alleged "Diminished Value" Damages Is Unsupported by the Evidence and Would be Unduly Speculative.**

Some objectors assert that the settlement should provide compensation for the alleged diminished value of vehicles as a result of the risk of future IMS-related damage. They assert that the resale value of their vehicles must have been negatively impacted by the fact that certain owners had experienced IMS-related damage and

13

others may in the future. A few objectors, including Ms. Weitzner, also assert that former owners allegedly received depressed prices because the IMS issue was known at the time of resale.[7]

These objectors have not taken into account the difficulties of establishing class-wide diminution in value damages in light of the twelve-year vehicle in-service period (as exists here), with owners buying and selling different at different times and in different circumstances. Although some class settlements have provided compensation for diminished value, courts have rejected the notion that class action settlements must provide compensation for diminished value. See, e.g., Vaughn v. Am. Honda Motor Co., 627 F. Supp. 2d 738, 749 (E.D. Tex. 2007) (rejecting objections concerning failure of settlement to compensate for diminution in value to vehicles with allegedly defective odometer, holding that "[i]t does not make the settlement unfair or unreasonable that the class has to release speculative claims for diminution in value"); In re Nissan, 2013 U.S. Dist. LEXIS 116720, at *41-42 (rejecting diminished value objections, noting that such claims "present additional challenges because proving them requires individualized inquiry"); Milligan, No. 3:09-cv-05418-RS, slip op. at 13 (observing that "diminution in value cases face significant obstacles regarding proof").

Here, there is no expert testimony or other evidence showing that publicity about the alleged defect resulted in any diminished resale value. Class-wide evidence of diminished value cannot be shown based on anecdotal claims of the experiences of individual class members. It is therefore reasonable to decline to provide compensation for diminished value. See Vaughn, 627 F. Supp. 2d at 749.

**D. The Settlement Reflects a Reasonable Compromise in Compensating Actual Damages While Excluding Reimbursement for "Preventative"**

---

[7] Ms. Weitzner states that because she could not afford to repair her car, she sold it for $7,000 when the Blue Book estimated value was approximately $27,000.

**Repairs.**

The Settlement Agreement requires proof of actual repairs for IMS related damage to qualify for compensation. Nine objectors argue that the settlement should provide compensation for "preventative" repairs, which previously had been undertaken, even though there no damage has occurred. Others argue that PCNA should be required to pay for "preventative" repairs for Class Vehicles which had so far not required any repair; i.e., the more than 90% of class vehicles in which the alleged defect has not manifested. Some objectors claim that these preventative repairs should be the subject of a recall.

The fact that the settlement requires actual IMS loss to have occurred as a predicate for monetary compensation does not make it unfair. See In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation, 2013 U.S. Dist. LEXIS 94484, at *253-254 (C.D. Cal. June 17, 2013) (rejecting objections based on the absence of preventative repair terms).

Finally, safety recalls are federal regulatory actions that generally may not be ordered as a remedy in a civil action. See Collado, 2011 U.S. Dist. LEXIS 133572, at *7 (noting that the fact NHTSA did not issue a recall and ended its investigation "is highly persuasive that a recall would be a drastic measure not justified in this settlement"); see also In re Nissan, 2013 U.S. Dist. LEXIS 116720, at *39 (rejecting objections based on the absence of a recall.). Furthermore, in over twelve years, the limited complaints submitted to NHTSA were not deemed sufficient to warrant even an investigation, much less a recall, and none of the complaints involved accidents, personal injuries, or otherwise implicated safety concerns. See Waimey Decl. at ¶ 8.

**E. The Settlement's Release Provisions are Appropriate and Necessary to Achieve a Final Resolution of the Issues in this Action.**

Objector Evan Morris objected to the scope of the release, contending that it improperly encompasses unnamed persons or entities involved in the design,

15

engineering, and manufacturing of the Class Vehicles and IMS components without requiring them to be formally joined in the litigation. This same objector further complains that the settlement is premature or invalid because those additional released entities have not yet been subjected to discovery. This objection has no merit. The releases in the settlement are reasonably tailored and necessary to secure the consent of PCNA to the Settlement Agreement. No defendant would agree to a release that permitted plaintiffs to continue to initiate litigation against individuals or entities related to the defendant. Releases of non-parties in class action settlements are readily approved and enforced. See, e.g., Brinton v. Bankers Pension Servs., 76 Cal. App. 4th 550 (1999) (enforcing a release granted to defendants in a prior class action in which defendants were not the named defendants but were nevertheless included within the scope of the settlement release).

**F. The Attorneys' Fee Provisions of the Settlement are Reasonable Because Aggregate Class Settlement Payments are not Capped or Tied to the Attorneys' Fee Payments.**

One objector objected to the attorneys' fee provisions of the settlement. Ms. Weitzner, through her attorney, objects on three primary grounds. First, she complains that the objection period ended before Class Counsel's fee petition was filed. Second, she contends that the settlement is improper because Class Counsel has already been awarded attorneys' fees. Third, she complains that meritorious objectors are unable to recover attorneys' fees under the Settlement Agreement.

The first two of these objections reflect a misunderstanding of the settlement and the relevant legal authority. Ms. Weitzner contends erroneously that there has already been an award of fees to plaintiffs' counsel pursuant to the settlement. There is no such provision in the Settlement Agreement. As discussed below, plaintiffs' counsel has the burden to establish the reasonableness of the fees requested. The Settlement Agreement merely provides that PCNA will not object to a fee petition by plaintiffs' counsel so

long as the requested fees and costs do not exceed $950,000. This type of provision is appropriate when, as here, it does not impact the substantive benefits offered to the class. See Shames v. Hertz Corp., 2012 U.S. Dist. LEXIS 158577, at *43-45 (S.D. Cal. Nov. 5, 2012) (holding that such a "clear sailing" provision was not collusive because attorneys' fees were separately negotiated and did not impact the benefits made available to the class). Nor does PCNA's agreement not to object relieve this Court of its duty to "carefully assess the reasonableness of a fee amount spelled out in a class action settlement agreement." Staton v. Boeing Co., 327 F.3d 938, 963 (9th Cir. 2003). In this regard, the Court notes that fee discussions took place after several months of negotiations over class settlement benefits, in a separate mediation session before a qualified and highly experienced mediator. See id. These factors weigh in favor of approving the Settlement Agreement. See Dennings v. Clearwire Corp., 2013 U.S. Dist. LEXIS 64021, at *23 (W.D. Wash. May 3, 2013) ("The court concludes . . . that neither the requested amount of attorneys' fees nor any other aspect of this Settlement is the product of collusion. The parties' negotiation was strictly at arm's length throughout, guided by a respected mediator." (internal citations omitted)).[8]

Similarly, although Ms. Weitzner is correct that the motion for fees was not filed until after the deadline for objections had passed, that does not preclude approval here. None of Ms. Weitzner's objections turn on the substance of the fee motion. Furthermore, the fee motion was made available on December 23, 2013, and was thus available prior to the hearing on final approval. Ms. Weitzner, who appeared through her attorney at the hearing on final approval, did not identify any flaws in the fee motion at the hearing. Lastly, Ms. Weitzner relies upon In re Mercury Interactive Corp. Sec. Litig., 618 F.3d 988 (9th Cir. 2010), for the proposition that a fee motion must be filed before the deadline for objections has passed. Mercury Interactive, however, involved a common-fund settlement. "[C]ourts have stressed that when awarding

---

[8]

attorneys' fees from a common fund, the district court must assume the role of fiduciary for the class plaintiffs." Id. at 994 (quotation omitted). Mercury Interactive is thus distinguishable from the settlement here, which does not involve a common fund apportioned between relief and fees. See, e.g., Calloway v. Cash Am. Net of California LLC, 2011 WL 1467356 (N.D. Cal. Apr. 12, 2011) ("This lack of a common fund obviates the due process concerns highlighted by the Mercury court."); In re Lifelock, Inc. Mktg. & Sales Practices Litig., 2010 WL 3715138 (D. Ariz. Aug. 31, 2010) ("[U]nlike the class members and attorneys in In re Mercury Interactive, there is no 'adversarial' relationship at the fee setting stage requiring the Court to assume the 'role of fiduciary for the class plaintiffs' because the fee award is not coming from a common fund and will not affect class members' rights.").

Ms. Weitzner's third objection, related to the alleged absence of attorneys' fees for meritorious objectors, is similarly without merit as it also misconstrues the Settlement Agreement. Nothing in the Settlement Agreement prevents objectors from applying for fees. But in order to qualify for such an award of fees, the objector must first confer a direct financial benefit for the class. See Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1051-52 (9th Cir. 2002) (holding that the objectors who caused "minor changes in the settlement agreement" were not entitled to fees because they did "not increase the fund or otherwise substantially benefit the class members"). Here, none of the objections have resulted in any benefit to the class. For the reasons set forth above, the objections to the settlement based on its provision relating to an award of attorneys' fees are overruled.

**V. ATTORNEYS' FEES**

Plaintiffs also move for an award of $950,000 in attorneys' fees and costs pursuant to the California Consumers Legal Remedies Act, Cal. Civ. Code § 1780(d). Plaintiffs also seek an incentive compensation of $3,750 for each of the four named plaintiffs. These fees will be paid directly by PCNA, and will reduce the benefits

afforded to the class. Pursuant to the Settlement Agreement, PCNA does not oppose plaintiffs' motion.

Attorneys' fees in California are evaluated by comparison to the lodestar, which is "produced by multiplying the number of hours reasonably expended by counsel by a reasonable hourly rate." Lealao v. Beneficial California, Inc., 82 Cal. App. 4th 19, 26 (2000). Here, plaintiffs have supplied billing records and affidavits indicating that they have incurred a lodestar in this case of $1,072,205, as well as costs of $48,644,64. After reviewing these materials, the Court concludes that the hourly rates and billed hours underlying this calculation, and thus the lodestar itself, are reasonable. Accordingly, because the fees requested are in fact lower than the lodestar in this case, the Court concludes that plaintiffs' request for attorneys' fees and costs should be granted. Similarly, the Court finds that the $3,750 incentive awards for the name plaintiffs are fair and appropriate. Cf. In re Cellphone Fee Termination Cases, 186 Cal. App. 4th 1380, 1393 (2010) (approving incentive awards of $10,000 per named plaintiff).

## VI. CONCLUSION

In accordance with the foregoing, the Court concludes that the Settlement Agreement is fair, adequate, and reasonable. Accordingly, the Court hereby:

1. GRANTS certification of the settlement class;
2. GRANTS final settlement approval
3. GRANTS the request for attorneys' fees and expenses;
4. GRANTS the request for incentive awards for name plaintiffs
5. OVERRULES all objections to the settlement.

Dated: January 30, 2014

_____
CHRISTINA A. SNYDER
UNITED STATES DISTRICT JUDGE